Maisie SHENANDOAH,
et al., Plaintiffs,

v.

Arthur Raymond HALBRITTER,
et al., Defendants

No. 02–CV–1430.

United States District Court,
N.D. New York.

Aug. 8, 2003.

Donald R. Daines, Esq., Princeton, NJ, for Plaintiffs.

MacKenzie Hughes, L.L.P. (David M. Garber, Esq., of Counsel), Syracuse, NY, Zuckerman Spaeder, L.L.P. (William W. Taylor, Esq., Michael R. Smith, Esq., David A. Reiser, Esq., Of Counsel), Washington, DC, for Defendants.

## MEMORANDUM–DECISION AND ORDER

MORDUE, District Judge.

### I. INTRODUCTION

Plaintiffs, nearly all of whom claim to be but only some of whom actually are members of the Oneida Indian Nation of New York, sue under the Indian Civil Rights Act ("ICRA"), 25 U.S.C. § 1301 *et seq.*. Plaintiffs seek the only remedy available under the statute—a writ of habeas corpus—in an effort to avoid compliance with an allegedly unlawful housing ordinance enacted by the Nation and/or the consequences of the Nation's enforcement of said ordinance against them. Presently before the Court is defendants' motion to dismiss the complaint for lack of subject matter jurisdiction and plaintiffs' cross-motion for preliminary injunctive relief. Since the filing of the afore-referenced motions, plaintiffs have also made a letter application for temporary emergency relief and a motion for reconsideration of this Court's oral denial of said application. Neither of these latter motions was filed in accordance with the Local Rules of this Court.

### II. FACTUAL AND PROCEDURAL BACKGROUND

In spite of various and highly contentious legal battles disputing the fact, defendant Raymond Halbritter is recognized by the federal government as the official representative of the Oneida Indian Nation of New York. *Shenandoah v. U.S. Dep't of Interior,* 159 F.3d 708, 710 (2d Cir.1998). Plaintiffs state that they have had a long-

standing relationship of ill-will with defendant Halbritter and those claiming authority through him. Plaintiffs assert that Halbritter, along with the other named defendants, are using power they obtained via illegitimate means over the Oneida Nation to arrest, imprison and restrain the freedom of plaintiffs as well as to seize and destroy plaintiffs' private property without providing compensation in violation of the ICRA. Specifically, plaintiffs allege that to retaliate against them for exercising their right of free speech, religious freedom and traditional Native American beliefs and practices in actively resisting the leadership of defendant Halbritter and those who derive authority from him, defendants concocted an unconstitutional "bill of attainder" disguised as a housing ordinance.

The ordinance, No. 00–03, requires the Oneida Nation's Commissioner of Public Safety to: 1) inspect all homes located on Territory Road, a portion of Oneida Nation lands known as the "32 acres," for compliance with the standards set forth in the National Building Code; 2) require repair or rehabilitation of homes not in compliance with the Code if repair or rehabilitation is possible; and 3) remove and/or demolish structures which cannot be repaired or rehabilitated. The Nation is required by the terms of the ordinance to arrange interim or permanent housing for residents of Territory Road whose homes were found to be unsuitable for continued habitation. Plaintiffs allege that the housing ordinance, which they refer to as an illegal "bill of attainder," was enacted with a discriminatory purpose and is designed to remove them forcibly from their homes in violation of their civil rights.

The housing ordinance at issue was upheld in September 2001, by Chief Judge Stewart F. Hancock, Jr. of the Oneida Indian Nation Trial Court as valid under the ICRA and as a reasonable exercise of the Oneida Indian Nation's power of self-government under *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978). Judge Hancock's decision was affirmed by the Oneida Nation Appellate Court in January 2002. The ordinance was enacted "as part of the Nation's continuing program to eliminate dilapidated and unsafe housing on Territory Road and to further the goal of providing a decent home and suitable living environment for persons residing on Nation land." *In re Application of Arthur F. Pierce, Case No. 01–014–CI, Oneida Indian Nation Trial Court* (Aug. 8, 2002, Hancock, Jr., J.). After passage of the ordinance, efforts by the Nation's Public Safety Commissioner to commence the inspection process were thwarted by plaintiffs who either left their homes or refused to permit entry by inspectors at the designated time for inspections.

Plaintiffs' complaint highlights the case of Danielle Patterson who previously resided in a trailer on the "32 acres" with her three minor children. In November 2001, Ms. Patterson was arrested and then released after she violently resisted compliance with an order of Judge Hancock permitting inspection of her home. When Nation police officers attempted to enter her home with the court order against her wishes, Patterson struck and kicked one of the officers. According to the Notice and Order of Condemnation, Demolition and Removal later issued by Arthur Pierce, the Oneida Nation Public Safety Commissioner, which ultimately resulted in destruction of Patterson's home, the trailer was "badly deteriorated" and "in such an overall dilapidated condition that [was] not fit for human habitation." Among other things, the Notice stated that the trailer had no foundation, no heating system, inadequate supports, boarded windows, missing and broken doors, holes in the floor, holes in the ceiling and a kitchen sink not connected to a drain. Plaintiffs allege that Ms. Patterson attempted to remedy the unsafe and

unsuitable conditions by having a foundation and/or a furnace installed. However, Pierce found that the trailer was "unsafe and dangerous" and the violations could not be corrected or the trailer rehabilitated. Plaintiff appealed this Notice to the Oneida Nation Tribal Court, but did not challenge the factual findings of Commissioner Pierce and thereafter refused to participate in any hearings or other proceedings.[1] Judge Hancock affirmed the administrative Notice and Order of Demolition in August 2002, after finding that it was fully supported by the evidence and was not arbitrary, capricious or otherwise unlawful. *See In re Application of Arthur F. Pierce, supra.*

On October 18, 2002, Patterson was rearrested and released three days later for refusing to appear in court and stand trial on the criminal charges stemming from the altercation with Nation police officers as they attempted to enforce the lawful inspection order for her home. Patterson pled guilty to one count of criminal contempt. Judge Richard Simons sentenced Patterson to "time served," released her unconditionally and informed her that she was "free to go." On October 23, 2002, Patterson's home was demolished in accordance with the commissioner's order.

Plaintiffs allege that Danielle Patterson and her children are now homeless since she refused the Nation's offer of substitute housing and that the remaining plaintiffs may soon be similarly situated due to en-

forcement of the alleged discriminatory housing ordinance. Plaintiffs assert that defendants—an eclectic group of lawyers, judges, police officers, sheriffs and Oneida Nation officials—have conspired and will continue to conspire to violate their civil rights by implementing the alleged discriminatory housing ordinance. Plaintiffs filed their complaint along with an *ex parte* application for a temporary restraining order ("TRO") on November 13, 2002. In the complaint, plaintiffs allege that the action is brought pursuant to the ICRA. They seek writs of habeas corpus together with injunctive relief enjoining defendants from further acting under the authority of the housing ordinance and relieving plaintiffs from further obligation to comply with administrative or court orders relating to the housing ordinance. Although plaintiffs reference defendants' alleged repressive control over Oneida Nation affairs and denial of "essential services" to them in retaliation for their refusal to abandon their religious, spiritual, societal and government traditions, no facts in support of these allegations appear in the complaint filed herein. Indeed, the complaint clearly states that its "narrow focus" is to petition the Court for writs of habeas corpus and injunctive relief to prohibit defendants from forcibly evicting plaintiffs from their homes, imprisoning them, demolishing their homes and leaving them homeless and unable to reside on the "32 acres."[2]

On the same day that plaintiffs filed their complaint, this Court issued a letter

---

**1.** It is notable that following issuance of the Order of Demolition for her home, Gary Gordon, the Nation's Housing Director wrote to Ms. Patterson and offered her a home in the Nation's Village of the White Pines Development less than a half mile from the location of her condemned trailer. According to Gordon, the home was less than ten years old, had recently been refurbished and was in excellent condition. The house had four bedrooms, two bathrooms, an attached garage and a full basement with a refrigerator, gas

stove, free water and sewer service along with available hook-ups for cable television and a washer and dryer. Gordon advised Patterson that the rent for the home would be prorated based on her income. Patterson rejected the offer of substitute housing as reported by the Nation's attorney at the appellate hearing before Judge Hancock in June 2002.

**2.** In an apparent attempt to broaden the factual bases for plaintiffs' claims and bring the complaint within the purview of federal court

order denying plaintiff's application for a TRO on the grounds that "possible future actions of defendants as alleged by plaintiffs do not demonstrate the present existence of a restraint on liberty sufficient to support habeas corpus." As a further matter, this Court advised counsel for plaintiffs that "there is a significant question regarding whether there is any basis for district court jurisdiction under [the ICRA], or, upon review, under any other authority cited by plaintiffs." Based thereupon, the Court declined to sign plaintiffs' order to show cause and returned the moving papers to plaintiffs.

Defendants thereafter moved to dismiss the complaint on the grounds that this Court lacks subject matter jurisdiction in

this case based on plaintiffs' failure to allege and their inability to prove that any of them are in actual custody as required by the habeas corpus statute upon which this action is premised. Plaintiffs cross-moved for a preliminary injunction. On May 8, 2003, plaintiffs' counsel wrote to the Court and requested emergency relief by way of a temporary injunction pending determination of the parties' respective motions. To wit, counsel for plaintiffs advised the Court that plaintiffs were then subject to a tribal court order compelling their attendance on May 12, 2003, before Judge Hancock to show cause why defendant Pierce should not be authorized to enter and inspect their homes pursuant to the challenged housing ordinance. Al-

jurisdiction, plaintiffs' counsel argues in opposition to the motion to dismiss that defendants have also used their illegitimate power to 1) "convict" plaintiffs of "treason" without any "trial;" 2) label plaintiffs as "dissidents" and target them for punitive treatment; 3) remove plaintiffs as "good standing" members of the Oneida Indian Nation and reclassify them as members "not-in-good-standing;" and 4) strip plaintiffs of Tribal benefits and entitlements. To wit, plaintiffs' counsel asserts that many plaintiffs were "convicted" by defendants of treason and made members "not-in-good-standing" following a 1993 press conference at which plaintiffs spoke out against defendants. Further, their counsel avers that some plaintiffs were "convicted" of treason by defendants and made members "not-in-good-standing" following a 1995 peace march during which many of the plaintiffs protested against defendants. In support of these allegations, none of which appear in the complaint, some plaintiffs submitted affidavits stating or suggesting that defendants have: (1) "removed" plaintiffs' "voices" thereby denying them any right to participate in the Nation's government or rule making; (2) socially ostracized and isolated plaintiffs by means of threats issued to other Oneida members who sought to maintain contact with plaintiffs; (3) barred plaintiffs from all Nation facilities including those providing health and recreational services; (4) barred plaintiffs from the Nation's Longhouse, where traditional religious ceremonies and political

meetings are held; (5) threatened to and/or have actually arrested plaintiffs and members of plaintiffs' families for "trespassing" on Nation facilities including the casino located outside of the Nation's sovereign territory; (6) banned plaintiffs from all Nation religious and cultural ceremonies and social events; (7) denied plaintiffs health benefits and coverage, heat and heating assistance, water, sewage and other vital services offered through the Nation; (8) seized and demolished privately owned vehicles, and (9) seized and confiscated plaintiffs' share of quarterly distribution payments (including bolts of cloth) that are made by the United States to the Oneida Nation for distribution by the Nation to each adult. Plaintiffs' counsel argues that the fact that defendants did impose these alleged actions upon plaintiffs is "directly relevant to the court's analysis as to whether the 'real' purpose behind defendants' latest so-called 'housing' ordinance is to inflict additional punishment upon plaintiffs in the form of forced eviction, confiscation, forfeiture and destruction of their homes and property and/or effectuate actual physical banishment from the Sovereign Territory through the refusal to reimburse plaintiffs for the value of the private home and denial of any assistance made available by defendants to others whom defendants want to be able to remain living on the Territory."

though plaintiffs had not utilized the proper procedure for either an application for TRO or regular motion, the Court elected to conduct a telephone conference with all counsel given the nature of the relief requested on May 9, 2003. During the telephone conference, the Court reminded counsel for plaintiffs of the content of the Court's November 2002, letter order denying the application for a TRO and advised counsel once again that there was a serious question concerning this Court's jurisdiction to act on plaintiffs' complaint.[3] Based thereupon, the Court denied orally plaintiffs' letter application for emergency temporary relief. In the absence of federal court jurisdiction—an obstacle brought to the attention of plaintiffs on the day their lawsuit was filed and subsequently during the telephone conference in May 2003—it should have been clear to plaintiffs that their remedy, if any, in challenging enforcement of the housing ordinance lay in those remedies available through the Oneida Nation Trial and Appellate Courts. After fully reviewing the submissions of the parties, the Court answers the "serious question" it posed concerning jurisdiction in this case against plaintiffs. Because this Court clearly lacks subject matter jurisdiction to entertain plaintiffs' claims as more fully discussed below, their complaint must be dismissed.

## III. DISCUSSION

### A. Applicable Standards of Review

The standards applicable to motions to dismiss are well-settled. On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the Court must accept the allegations of the complaint as true, and draw all reasonable inferences in favor of the nonmoving party. See Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir.1998); Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir.1995). In addition, the Court may not dismiss the complaint unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Nettis v. Levitt, 241 F.3d 186, 191 (2d Cir.2001) (quotation omitted). Therefore, the issue before the Court on such a motion "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." King v. Simpson, 189 F.3d 284, 287 (2d Cir.1999) (quoting Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir.1995)).

When a defendant moves to dismiss for lack of subject matter jurisdiction, however, a different standard is applied. In considering a motion to dismiss for lack of subject matter jurisdiction under Fed. R.Civ.P. 12(b)(1), federal courts "need not accept as true contested jurisdictional allegations." Jarvis v. Cardillo, Civil Case No. 98–5793, 1999 WL 187205, at * 2 (S.D.N.Y. April 5, 1999). Rather, a court may resolve disputed jurisdictional facts by referring to evidence outside the pleadings. See Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi, 215 F.3d 247, 253 (2d Cir.2000); Filetech S.A. v. France

---

**3.** Prior to the telephone conference, plaintiffs' counsel had brought to the attention of the Court a previous case involving some of the same parties wherein then District Court Judge Rosemary Pooler issued an oral order restraining the parties from acting to disturb the status quo pending her review of the merits of the parties cross-motions for dismissal and injunctive relief. In that case, plaintiffs' habeas corpus claim—premised on many of the same factual allegations as are set forth here—was dismissed for lack of subject matter jurisdiction because of failure to allege a sufficiently severe restraint on their liberties. See Shenandoah v. United States Dep't of Interior, 1997 WL 214947, at *8 (N.D.N.Y.1997). Judge Pooler's decision was thereafter affirmed by the Second Circuit. See Shenandoah, 159 F.3d at 714.

*Telecom S.A.*, 157 F.3d 922, 932 (2d Cir. 1998). As the party "seeking to invoke the subject matter jurisdiction of the district court," plaintiff bears the burden of demonstrating that there is subject matter jurisdiction in this case. *Scelsa v. City Univ. of New York*, 76 F.3d 37, 40 (2d Cir.1996).

### B. *Writs of Habeas Corpus*

█ Although Title I of the ICRA lists a number of substantive rights afforded to individuals that serve to restrict the power of tribal governments, · see 25 U.S.C. § 1302, Title I "does not establish or imply a federal civil cause of action to remedy violations of § 1302." *See Shenandoah*, 159 F.3d at 713 (citing *Santa Clara Pueblo*, 436 U.S. at 72, 98 S.Ct. 1670); *Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d 874, 884 (2d Cir.), *cert. denied*, 519 U.S. 1041, 117 S.Ct. 610, 136 L.Ed.2d 535 (1996)). Rather, "Title I of the ICRA identifies explicitly only one·federal court procedure for enforcement of the substantive guarantees of § 1302: § 1303 makes available to any person '[t]he privilege of the writ of habeas corpus …, in a court of the United States, to test the legality of his detention by order of an Indian tribe.' " *Id.* ((quoting *Poodry*, 85 F.3d at· 882) (quoting 25 U.S.C. § 1303)). "[S]ection 1303 was intended by Congress to have no broader reach than the cognate statutory provisions governing collateral review of state and federal action," *id.* at 714 (quoting *Poodry*, 85 F.3d at 901 (Jacobs, J., dissenting) and 879–80 (majority opinion)), and thus "plaintiffs must allege that defendants posed a 'severe actual or potential restraint on [their] liberty.' " *Id.*

Regarding plaintiffs' habeas claim, defendants assert that since plaintiffs have failed to allege or submit evidence that they are or were in actual custody at the time the lawsuit was commenced, this Court lacks subject matter jurisdiction to consider it on the merits. Plaintiffs contend that they need not allege or demonstrate that they are in actual custody since the liberties they allege have been or will be restrained by defendants are sufficient to bring plaintiffs within ICRA's habeas provision. Plaintiffs argue correctly that habeas relief does address more than actual physical custody, and includes parole, probation, release on one's own recognizance pending sentencing or trial, and in the case of tribal affairs, permanent banishment. *Poodry*, 85 F.3d at 893–94, 897 (collecting cases). In *Poodry*, the petitioners were "convicted [ ] of·treason," sentenced to "permanent banishment," and "stripped of … Indian citizenship;" their names were ·"removed from the Tribal rolls" and they "permanently [lost] any and all rights afforded [tribal] members." *Id.* at 876, 878. Although petitioners there were not actually ejected from the reservation, a divided panel of the Second Circuit held that these deprivations of liberty, including a sentence of "permanent banishment," were sufficiently severe to bring petitioners within the ICRA's habeas provision. *Id.*

In contrast, plaintiffs in the instant case have not alleged that they were banished from the Nation, deprived of tribal membership, formally convicted of any crime, or that defendants attempted in any way to remove them from Oneida territory. The complaint and factual evidence submitted by plaintiffs in opposition to the motion to dismiss alleges and establishes that plaintiffs' habeas claims are premised upon eviction of one plaintiff, potential eviction of others, destruction of property of one plaintiff and potential further destruction of property of other plaintiffs. Indeed, plaintiffs cannot allege with certainty what further actions, if any, defendants will take in enforcing the housing ordinance against the homes of additional plaintiffs since the inspection, condemnation and demolition process has been

stayed pending disposition of plaintiffs' appeals in the Oneida Nation Appellate Court. There are no allegations suggesting or facts establishing that defendants attempted to remove plaintiffs from Oneida Nation lands. Rather, the actions challenged by plaintiffs solely concern defendants attempts to evict plaintiffs from unsafe housing in the "32 acres" and relocate them to suitable housing within the Oneida Nation territory. The "crimes" plaintiffs' counsel claims defendants have convicted plaintiffs of is being "dissidents," but unlike *Poodry*, there have been no official or formal proceedings taken against plaintiffs insofar as charging them with actual crimes, affecting their tribal membership or banishing them from Nation territory.

Insofar as allegations by various plaintiffs concerning retaliatory conduct by defendants such as withholding of housing and/or heating assistance, withholding of government distribution checks and confiscation of boats and automobiles, and even the destruction or threatened destruction of their homes, it is clear that these alleged incidents concern economic restraints and/or personal property rather than actual liberty interests. As a further matter, the allegations which appear in affidavits filed by plaintiffs in opposition to defendants' motion concerning loss of various tribal privileges, loss of their "voices," and banishment from various Nation facilities and activities are precisely the same

allegations found to be insufficient to trigger ICRA jurisdiction in the previous litigation between these parties. *See Shenandoah*, 159 F.3d at 715.

█ Finally, plaintiffs' argument that the challenged housing ordinance is an *ex post facto* law or "bill of attainder" is unavailing. In the first instance, the housing ordinance fits into neither unlawful category cited by plaintiffs since it does not target individuals nor does it "punish" persons in the traditional prohibitive sense.[4] Secondly, even if the law was, as plaintiffs suggest, designed solely to discriminate against them and was "unconstitutional" in its enactment or enforcement, plaintiffs cite no authority nor has the Court found any to support the argument that such action by defendants would trigger habeas jurisdiction—the only federal jurisdiction available—under the ICRA in the absence of a custody violation or a substantial deprivation of liberty. Indian tribes are "distinct political entities" retaining inherent powers to manage internal tribal matters. *See Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 16, 8 L.Ed. 25 (1831). Because tribal powers of self-government are "retained" and predate the federal Constitution, "those constitutional limitations that are by their terms or by implication framed as limitations on federal and state authority do not apply to tribal institutions exercising powers of self-government with respect to members

---

4. "A bill of attainder [is] 'a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial.'" *Selective Serv. Sys. v. Minnesota PIRG*, 468 U.S. 841, 846–47, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984) (quoting *Nixon v. Administrator of General Services*, 433 U.S. 425, 468, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977)). It is clear that the housing ordinance at issue herein cannot be so described since it does not set forth standards for finding **individuals** guilty of anything, but rather, establishes minimum standards for housing located on Territory Road in the "32 acres." The housing ordinance does not contain a "punishment" provision against individuals, but rather establishes a procedure for inspecting suspected sub-standard housing, allowing repair or rehabilitation of the property if possible and condemning the property if necessary. As such, the housing ordinance is not an *ex post facto* law which declares previously legal conduct illegal and imposes punishment retroactively for past conduct.

of the tribe or others within the tribe's jurisdiction." *Poodry,* 85 F.3d at 880–81. "Members of federally recognized Indian tribes are citizens of the United States and are therefore afforded constitutional protection against violations of individual rights by federal and state institutions, but constitutional provisions limiting federal or state authority are of no force in constraining actions of tribal governments." *Id.* at 881 n. 7 (citing 8 U.S.C. § 1401(b))

■■ The sole basis for enforcement of rights guaranteed by the ICRA is the habeas provision which requires proof of a custody violation or substantial deprivation of liberty—evidence of which is wholly absent from plaintiffs' complaint and submissions. The only plaintiff who is alleged to have ever been in actual custody of defendants is Danielle Patterson, but it is clear that the custody was limited in duration and related to alleged criminal conduct of plaintiff, not any alleged violation of the challenged housing ordinance. Moreover, it is clear that Danielle Patterson is not now in custody and was not in custody at the time this action was commenced. Based thereupon, plaintiffs have not alleged a "severe actual or potential restraint on [their] liberty," *Poodry,* 85 F.3d at 880, and the complaint must be dismissed.[5] Based thereupon, the Court need not address defendants alternative arguments concerning plaintiffs' failure to exhaust administrative remedies prior to seeking habeas corpus relief[6] or plaintiffs' cross-motion for issuance of a preliminary injunction.

## IV. CONCLUSION

In view of the foregoing, defendants' motion to dismiss the complaint is hereby

---

5. To the extent that plaintiffs seek injunctive or other equitable relief in addition to writs of habeas corpus, these claims are also subject to dismissal. *See Santa Clara Pueblo,* 436 U.S. at 71, 98 S.Ct. 1670 (Section 1302 [of the ICRA] does not impliedly authorize actions for declaratory or injunctive relief against either tribes or their officers based on the principle of sovereign tribal immunity). In this case, each of the named defendants is alleged to be either a member of the Oneida Nation or a non-member employed, appointed or authorized to act on behalf of the Nation and/or defendant Halbritter. Plaintiffs do not allege that any defendants acted as officers of any government other than the Nation or acted outside the authority vested or conferred by the Nation. As such, defendants, all of whom are alleged to be "officers" or agents of the Nation, enjoy tribal sovereign immunity for actions taken in furtherance of conducting official Nation business. *See Hardin v. White Mountain Apache Tribe,* 779 F.2d 476, 479 (9th Cir.1985) (protection of tribal sovereign immunity "extends to individual tribal officials acting in their representative capacity and within the scope of their authority"). A tribal official—even if sued in his "individual capacity"—is only "stripped" of tribal immunity when he acts "manifestly or palpably beyond his authority." *Bassett v. Mashantucket Pequot Tribe,* 204 F.3d 343, 359 (2d Cir.2000). There are no allegations in this case that any defendant acted "without any colorable claim of [Nation] authority." *Bassett,* 221 F.Supp.2d at 281. To the contrary, throughout the complaint, plaintiffs assert that all named defendants "serve [defendant] Halbritter" as "members" of his administration and used their positions as Nation officials to discriminate against and abuse plaintiffs.

6. Plaintiffs contend that their tribal remedies, which involve cooperation with the inspection process and appearing in the Nation courts before judges, some of whom are defendants in this action, are futile. Defendants characterize the futility argument as speculative because plaintiffs have refused to participate in any tribal proceedings regarding the housing ordinance and it is not known what the outcome of any further inspections or condemnations will be since none have occurred. Defendants note that at least one property on Territory Road was found to be in compliance with the National Building Code after being inspected pursuant to the housing ordinance.

GRANTED and plaintiffs' motion for a preliminary injunction is DENIED.

IT IS SO ORDERED.