**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LOUISE VICTORIA JEFFREDO; JOYCE
JEAN JEFFREDO-RYDER; CHRISTOPHER
L. RYDER; JEREMIAH S. RYDER;
JONATHAN B. RYDER; MICHAEL JOHN
JEFFREDO; ELIZABETH VILLINA
JEFFREDO; JACKIE M. MADARIAGA;
KELLY M. MADARIAGA; CARRIE
MADARIAGA; LAWRENCE
MADARIAGA; WILLIAM A. HARRIS;
STERLING HARRIS; APRIL HARRIS;
MINDY PHENEGER; RICHARD HARRIS,
   *Petitioners-Appellants.*

    v.

MARK A. MACARRO; DONNA
BARRON; MARC CALAC; MARK
LUKER; ANDREW MASIEL; RUSSELL
BUTCH MURPHY; KENNETH PEREZ;
DARLENE AZZARELLI; CHRISTINE
LUKER,
   *Respondents-Appellees.*

No. 08-55037

D.C. No.
CV-07-01851-JFW

OPINION

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted
April 17, 2009—Pasadena, California

Filed December 22, 2009

16699

Before: Johnnie B. Rawlinson and N. Randy Smith,
Circuit Judges, and Claudia Wilken,* District Judge.

Opinion by Judge N.R. Smith;
Dissent by Judge Wilken

*The Honorable Claudia Wilken, United States District Judge for the
Northern District of California, sitting by designation.

**COUNSEL**

Paul Harris and Patrick Romero Guillory, Dolores Park Law Offices, San Francisco, California, for the petitioners-appellants.

Frank Lawrence, Holland and Knight, Los Angeles, California, and John Schumacher, Law Office of John Schumacher, LLC, Riverton, Wyoming, for the respondents-appellees.

---

## OPINION

N.R. SMITH, Circuit Judge:

The Pechanga Band of the Luiseño Mission Indians ("Pechanga Tribe") disenrolled a number of its members ("Appellants") for failing to prove their lineal descent as members of the Tribe. Federal courts generally lack jurisdiction to consider any appeal from the decision of an Indian tribe to disenroll one of its members. *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 72 n.32 (1978). Appellants, therefore, brought this petition for habeas corpus under 25 U.S.C. § 1303 of the Indian Civil Rights Act ("ICRA"), claiming their disenrollment by members of the Pechanga Tribal Council ("Appellees") was tantamount to an unlawful detention. Despite the novelty of this approach, we nonetheless lack subject matter jurisdiction to consider this claim, because Appellants were not detained. We hold that Appellants cannot bring their claims under § 1303 of the ICRA and therefore affirm the district court.

## I. BACKGROUND

The Pechanga Tribe is a federally-recognized Indian tribe. 72 Fed. Reg. 13648, 13650 (Mar. 22, 2007). The Tribe's ultimate governing authority consists of all of the adult members of the Tribe ("General Membership"). On December 10, 1978, the Pechanga Tribe adopted the Constitution and Bylaws of the Temecula Tribe of Luisenño Mission Indians ("Pechanga Constitution"). Article II of the Pechanga Constitution provides:

>Membership is an enrolled member documented in the Band's Official Enrollment Book of 1979.
>
>Qualifications for membership of the Temecula Band of Luiseno Mission Indians Are:
>
>>A.  Applicant must show proof of Lineal Descent from original Pechanga Temecula people.
>>
>>B.  Adopted people, family or Band, and non-indians cannot be enrolled. *Exception*: People who were accepted in the Indian Way prior to 1928 will be accepted.
>>
>>C.  If you have ever been enrolled or recognized in any other reservation you cannot enroll in Pechanga.

At issue here is subsection A, requiring applicants to "show proof of Lineal Descent from original Pechanga Temecula people." In late 2002 and early 2003, the Enrollment Committee received information from its members alleging that a number of Pechanga Tribe members were not lineal descendants from the original Pechanga Temecula people. Therefore, according to the Pechanga Enrollment Disenrollment Procedure ("Disenrollment Procedures"), the Enrollment Committee was required to investigate the allegations. Allegations surrounded five lines of descent that allegedly did not qualify for membership under the Pechanga Constitution.

According to the Pechanga Disenrollment Procedure, disenrollment is "revoking a person's membership when it is found that they do not meet the requirements set forth on the enrollment application which was approved by the Band." The Disenrollment Procedures were adopted by the Pechanga Tribe (1) to correct mistakes that resulted when tribal mem-

bership was mistakenly approved and (2) to provide a process that would allow a fair hearing in the disenrollment procedure. Under the Disenrollment Procedures, the Enrollment Committee initiates a disenrollment process against those individuals allegedly not qualifying for membership in the Tribe. After the initiation of the disenrollment, the Enrollment Committee must provide adequate notice to the individual to be summoned to a meeting with the Enrollment Committee. The notice must (1) state that the Enrollment Committee has questions regarding enrollment; (2) stress the importance of responding to the notice; and (3) request a meeting within thirty days of the response. Unless the person receiving the notice chooses to be automatically disenrolled, he or she must respond. Once a response has been filed, the Enrollment Committee has thirty days to set up a meeting. At that meeting, the Enrollment Committee must show specific evidence that would prove that the documentation provided for enrollment does not provide evidence of lineal descent. If the Enrollment Committee provides such evidence, the individual then is allowed another thirty days to provide additional information to prove her or his lineal descent. If the individual provides further evidence that satisfies the Enrollment Committee as to his lineal descent, the process is terminated and the individual keeps his or her membership status. If the Enrollment Committee is not satisfied by the further evidence, the individual will be disenrolled and the Tribal Council is notified of the disenrollment.

If the Enrollment Committee fails to follow these steps or is negligent in any way, the individual can appeal to the Tribal Council for a fair hearing. At the hearing, the Tribal Council only reviews the documentation that the Enrollment Committee reviewed. The individual is not entitled to legal representation at the hearing. If the Tribal Council finds there was an error, the Enrollment Committee reevaluates the case. If the appeal is successful, membership will be reinstated.

Disenrollment does not mean that a person is banished from the Pechanga Reservation. The Pechanga Tribe instead

has specific procedures for exclusion and eviction. These requirements are set forth in the "Exclusion and Eviction Regulations." Under these regulations, the Pechanga Tribe may exclude and or evict someone from the reservation for: "(1) [v]iolating tribal laws and ordinances; (2) [c]reating conditions which pose a threat to the public health, safety and welfare; (3) [e]ngaging in criminal activities on the Pechanga Reservation, by finding of the Tribal Council, or being convicted of one or more felony crimes; (4) [b]eing declared a public nuisance by the Tribal Council; [or] (5) [c]reating a breach of peace, including but not limited to public drunkenness." The Exclusion and Eviction Regulations dictate the procedure to evict and or exclude and the opportunity to appeal such exclusion.

In early 2003, the Enrollment Committee began addressing the allegations regarding the lineal descent of certain members. On March 7, 2003, the Tribal Council issued a Notice and Order regarding pending disenrollment matters. The Notice and Order mandated that the Enrollment Committee: (1) "use a fair and impartial decision by a majority of the committee to review a file;" (2) follow Robert's Rules of Order; and (3) allow adequate time for presentation of evidence as required under the Disenrollment Procedures.

Sometime before March 7, 2003, the Enrollment Committee determined that the first three lines of descent met the membership criteria. Then it turned its attention to those members who claimed a lineal descent through Paulina Hunter. On May 3, 2005, after a proper vote, the Enrollment Committee summoned Appellants and notified them that the Enrollment Committee believed there were grounds to initiate the disenrollment process. The summonses (1) notified Appellants that the disenrollment procedures had been initiated, (2) requested additional information concerning Appellants' family history, and (3) notified Appellants that they were required to set up an Initial Meeting with the Enrollment Committee.

Meetings were held with Appellants in June of 2005. The Enrollment Committee provided Appellants with a copy of all factual records in its possession. The Enrollment Committee then stated its concerns about each Appellant's claim of lineal descent. Appellants were also notified that they had thirty days to submit information supporting their claim of lineal descent. The Enrollment Committee emphasized that Appellants' enrollment would be measured by the Pechanga Constitution's requirements. The Enrollment Committee advised each Appellant that no decision would be made until it received all additional information.

On March 16, 2006, the Enrollment Committee (after review of the full record) disenrolled Appellants for failure to prove lineal descent from an original Pechanga Temecula person. Appellants exercised their right to appeal to the Tribal Council. The Tribal Council held hearings on July 21, 2006. The Tribal Council affirmed the Enrollment Committee, "finding: (1) there was no evidence of unfair or partial treatment of Appellants by the Enrollment Committee; (2) there was no evidence of negligence in the handling of Appellants' case by the Enrollment Committee; and (3) there was insufficient proof that the Enrollment Committee violated the disenrollment procedures."

Appellants then filed a petition for writ of habeas corpus in the Central District of California. Appellants moved for summary judgment. Appellees filed a Motion to Dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, claiming that the district court lacked subject matter jurisdiction. The district court granted the Motion to Dismiss. Appellants appealed the district court decision here.

## II.  DISCUSSION

We review *de novo* dismissals for lack of subject matter jurisdiction under Rule 12(b)(1). *Carson Harbor Village, Ltd. v. City of Carson*, 353 F.3d 824, 826 (9th Cir. 2004). We also

review *de novo* a district court's denial of a petition for writ of habeas corpus under the ICRA. *Selam v. Warm Springs Tribal Corr. Facility*, 134 F.3d 948, 951 (9th Cir. 1998).

Ordinarily, federal courts lack jurisdiction to consider an appeal from the decision of an Indian Tribe to disenroll one of its members. "A tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community." *Santa Clara Pueblo*, 436 U.S. at 72 n.32; *Cherokee Intermarriage Cases*, 203 U.S. 76 (1906)). Because of this precedent, Appellants did not directly appeal the Tribe's decision. Instead, they petitioned the court for a writ of habeas corpus under the ICRA to collaterally challenge their disenrollment.

**[1]** Section 1303 of the ICRA provides: "The privilege of the writ of habeas corpus shall be available to any person, in a court of the United States, to test the legality of his detention by order of an Indian tribe." 25 U.S.C. § 1303. The term "detention" in the statute must be interpreted similarly to the "in custody" requirement in other habeas contexts. *See Moore v. Nelson*, 270 F.3d 789, 791 (9th Cir. 2001) ("There is no reason to conclude that the requirement of 'detention' set forth in the Indian Civil Rights Act § 1303 is any more lenient than the requirement of 'custody' set forth in the other habeas statutes." (citation omitted)). Therefore, an ICRA habeas petition is only proper when the petitioner is in custody. *Id.* at 791 (explaining the custody requirement).

We have also held that a litigant must first exhaust tribal remedies before properly bringing a petition for writ of habeas corpus. *Selam*, 134 F.3d at 953-54 (explaining the exhaustion requirement); *see also* Felix S. Cohen, *Handbook of Federal Indian Law* § 9.09 (2005). Even when a federal court has jurisdiction over a claim, if the claim arises in Indian country, the court is required to "stay its hand" until the party has exhausted all available tribal remedies. Cohen, *Handbook of Federal Indian Law* § 7.04 (citing *Iowa Mut.*

*Ins. Co. v. LaPlante*, 480 U.S. 9, 16 (1987); *Nat'l Farmers Union Ins. Cos. v. Crow Tribe*, 471 U.S. 845, 857 (1985)). "The Supreme Court's policy of nurturing tribal self-government strongly discourages federal courts from assuming jurisdiction over unexhausted claims." *Selam*, 134 F.3d at 953. There is authority for relaxing the exhaustion requirement where the party can show that exhaustion would be futile or that tribal courts offer no adequate remedy. *See id.* at 954.

**[2]** Therefore, "all federal courts addressing the issue mandate that two prerequisites be satisfied before they will hear a habeas petition filed under the IRCA: [(1)] The petitioner must be in custody, and [(2)] the petitioner must first exhaust tribal remedies.". Cohen, *Handbook of Federal Indian Law* § 9.09 & § 9.09 n.280. We therefore have no jurisdiction to hear a petitioner's claim for habeas corpus, unless both of these conditions are met.

Additionally, some courts have further imposed a third requirement; that the tribal proceeding be criminal and not civil.[1] *See, e.g.*, *Quair v. Sisco* (*Quair I*), 359 F. Supp. 2d 948, 963 (E.D. Cal. 2004); *Alire v. Jackson*, 65 F. Supp. 2d 1124, 1127 (D. Ore. 1999); *see also* Cohen, *Handbook of Federal Indian Law* § 9.09 & § 9.09 n.280 (noting that while custody and exhaustion are prerequisites before a reviewing court will hear a habeas petition, courts have "struggled" with whether there is also a third requirement that the proceedings be criminal in nature).

---

[1]The dissent focuses on the distinction between civil and criminal actions. However, it should be noted that while this distinction has been mentioned by some courts, the distinction is immaterial unless the first two requirements of custody and exhaustion are met.

**I.  Appellants do not meet the requirements for the court to have jurisdiction under § 1303 of the ICRA.**

*A.  Appellants were not detained/in custody.*

Appellants contend that (1) the actual restraints, (2) the potential restraints, and (3) their lost Pechanga identity all amount to detention under § 1303. We do not agree.

1.

**[3]** Appellants contend that, because they have been denied access to the Senior Citizens' Center, cannot go to the health clinic, and their children can no longer go to tribal school, they have been detained. We disagree. *Jones v. Cunningham* requires that "conditions and restrictions . . . significantly restrain [one's] liberty" in order to invoke § 1303 jurisdiction. 371 U.S. 236, 243 (1963). The Second Circuit has said that "under *Jones* and its progeny, a severe actual or potential restraint on liberty" is necessary for jurisdiction under § 1303. *See Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d 874, 880 (2d Cir. 1996); *see also Shenandoah v. Halbritter*, 275 F. Supp. 2d 279, 285 (N.D.N.Y. 2003) (quoting *Poodry* for the same proposition). We agree with our colleagues on the Second Circuit and hold that § 1303 does require "a severe actual or potential restraint on liberty." *Poodry*, 85 F.3d at 880.

**[4]** In the case before us, the denial of access to certain facilities does not pose a severe actual or potential restraint on the Appellants' liberty. Appellants have not been banished from the Reservation. Appellants have never been arrested, imprisoned, fined, or otherwise held by the Tribe. Appellants have not been evicted from their homes or suffered destruction of their property. No personal restraint (other than access to these facilities) has been imposed on them as a result of the Tribe's actions. Their movements have not been restricted on the Reservation. Faced with a similar situation, the Second

Circuit also determined that less severe restraints such as loss of one's "voice" in the community, loss of health insurance, loss of access to tribal health and recreation facilities, loss of quarterly distributions to tribal members, and loss of one's place on the membership roles of the tribe are simply "insufficient to bring plaintiffs within [the] ICRA's habeas provision." *Shenandoah v. U.S. Dept. of Interior*, 159 F.3d 708, 714 (2d Cir. 1998).

**[5]** Appellants contend that the denial of access to these facilities is similar to the restraint found in *Poodry*. This is not *Poodry*. In *Poodry*, the petitioners were convicted of treason, sentenced to permanent banishment, and permanently lost any and all rights afforded to tribal members. *See Poodry*, 85 F.3d at 876, 878. Appellants have not been convicted, sentenced, or permanently banished. We therefore hold that the limitation of Appellants' access to certain tribal facilities does not amount to a "detention."

2.

**[6]** Appellants contend that, as non-members of the tribe, they are "under a continuing threat of banishment/exclusion." No court has held that such a threat is sufficient to satisfy the detention requirement of § 1303.

> The custody requirement of the habeas corpus statute is designed to preserve the writ of habeas corpus as a remedy for severe restraints on individual liberty. Since habeas corpus is an extraordinary remedy whose operation is to a large extent uninhibited by traditional rules of finality and federalism, its use has been limited to cases of special urgency, leaving more conventional remedies for cases in which the restraints on liberty are neither severe nor immediate.

*Hensley v. Mun. Court*, 411 U.S. 345, 351 (1973). Applying this principle, we previously held that a threat of confinement

is not severe nor immediate enough to justify the remedy. *Edmunds v. Won Bae Chang*, 509 F.2d 39, 40-41 (9th Cir. 1975) (denying habeas relief under 28 U.S.C. §§ 2241, 2254). In *Edmunds*, the petitioner was subject to a court-imposed fine, which could be enforced by jail time. *Id.* at 41. The court held, however, that until confinement is imminent (like the confinement in *Hensley*) there can be no justification for use of the habeas corpus remedy. *Id.* We see no reason not to analogize to the court's construction of the criminal habeas corpus provisions in *Edmunds*. Therefore, we hold that the potential threat of future eviction is not sufficient to satisfy the detention requirement of § 1303.

**[7]** Appellants argue that, while no such procedures have been commenced to exclude or evict Appellants, there is a potential that they could be excluded. Under the Pechanga Non-Member Reservation Access and Rental Ordinance "[a]ccess to and residency within the Reservation is a privilege which may be granted or denied to an individual upon proper authority of the Pechanga Band." However, the Pechanga Tribe enacted exclusion and eviction regulations that provide a process for eviction in an effort to protect law and order on the reservation and to provide uniform procedures for exclusion and eviction. These provisions apply equally to those who have been disenrolled and those who are current members of the tribe. Appellants admit they have never been subjected to exclusion or eviction proceedings.

3.

**[8]** Appellants lastly contend that disenrollment, stripping them of their Pechanga citizenship, is enough of a significant restraint on their liberty to constitute a detention. While we have the most sympathy for this argument, we find no precedent for the proposition that disenrollment alone is sufficient to be considered detention under § 1303. While "Congress' authority over Indian matters is extraordinarily broad . . . the role of courts in adjusting relations between and among tribes

and their members [is] correspondingly restrained." *Santa Clara Pueblo*, 436 U.S. at 71. Further, "[a] tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community." *Id.* at 71 n.32 (citing *Roff v. Burney*, 168 U.S. 218 (1897); *Cherokee Intermarriage Cases*, 203 U.S. 76). Thus (while Congress may have authority in these matters) in the complete absence of precedent, we cannot involve the courts in these disputes.

**[9]** This court is without jurisdiction to review direct appeals of tribal decisions regarding disenrollment of members. *See, e.g., Santa Clara Pueblo*, 436 U.S. at 72 n.32. We cannot circumvent our lack of jurisdiction over these matters by expanding the scope of the writ of habeas corpus to cover the exact same subject matter. At its heart, this case is a challenge to disenrollment of certain members by the tribe. It is precisely because we lack jurisdiction to hear such claims, however, that Appellants brought this case under habeas corpus law. We find (and the parties direct us to) nothing in the legislative history of § 1303 that suggests the provision should be interpreted to cover disenrollment proceedings. Because nothing in the legislative history suggests otherwise and because binding precedent precludes review of disenrollment proceedings, we cannot accept Appellants' invitation to expand habeas corpus here.

**[10]** Appellants contend that their disenrollment is analogous to denaturalization. We disagree. Appellants cite *Trop v. Dulles*, 356 U.S. 86 (1958), to support this proposition. The court in *Trop* was confronted with the constitutionality of a statute that revoked United States citizenship for desertion during wartime even if the desertion was unrelated to any actions on behalf of a foreign government. *Id.* at 87-88. *Trop* is inapposite to this case. In *Trop* the statute left the defendant stateless. *Id.* Further, the statute was penal in nature. *Id.* at 96. Here Appellants have not been left stateless, and nothing in the record indicates that the disenrollment proceedings were

undertaken to punish Appellants. Therefore, *Trop* is not controlling.

### B. Appellants have not exhausted their tribal remedies in order to challenge a claim of banishment from the reservation.

**[11]** Appellants argue that disenrollment is similar to banishment and that they are therefore detained. However, Appellants have not been banished from the Reservation. The Pechanga Tribe has established uniform Exclusion and Eviction Regulations for excluding both members and nonmembers of the tribe from the Reservation. The Exclusion and Eviction Regulations also establish the procedures for appealing one's exclusion or eviction. Appellants have not been subjected to any exclusion or eviction proceedings. Therefore, they have not exhausted their claims for exclusion from the reservation or denial of access to it as established in the Exclusion and Eviction Regulations. We then lack jurisdiction over any of Appellants' claims for exclusion or eviction.

### C. The tribal proceeding was not criminal in nature.

**[12]** Failure to establish detention alone is sufficient to defeat a habeas claim under the ICRA. However, because some courts also require that ICRA habeas petitions be criminal proceedings, we address that issue here. The parties agree that the disenrollment procedures are civil proceedings. Whether habeas relief under the ICRA can be granted in a non-criminal context is an issue of first impression for this court. Three of our circuit's district courts have previously determined that § 1303 only applies to tribal criminal proceedings. *See Quair v. Sisco* (*Quair II*), 2007 WL 1490571 *2 (E.D. Cal. May 21, 2007) ("Petitioners seeking relief under § 1303 must establish that . . . the proceeding at issue is criminal and not civil in nature . . . ." (citing *Quair I*, 359 F. Supp. 2d at 963)); *Alire*, 65 F. Supp. 2d at 1127 ("[W]rit of habeas

corpus available under section 1303 is limited to unlawful detentions arising out of tribal criminal decisions."). We agree.[2]

**[13]** The Supreme Court has found that habeas corpus under the ICRA is "the exclusive means for federal-court review of tribal criminal proceedings." *Santa Clara Pueblo*, 436 U.S. at 67. The Court has also found that "Congress considered and rejected proposals for federal review of alleged violations of the [ICRA] arising in a civil context." *Id.* We also note "[i]n interpreting § 1303, courts should hesitate to so expand the meaning of 'criminal' and 'detention' such that, as a practical matter, all tribal decisions affecting individual members in important areas of their lives become subject to review in federal court. Such a result would be inconsistent with the principle of broad, unreviewable tribal sovereignty in all but criminal cases involving physical detention." *Quair II*, 2007 WL 1490571 at *2. Lastly, "[g]iven the often vast gulf between tribal traditions and those with which federal courts are more intimately familiar, the judiciary should not rush to create causes of action that would intrude on these delicate matters." *Santa Clara Pueblo*, 436 U.S. at 72 n.32.

Appellants contend that both *Poodry* and *Quair I*, support their position that habeas relief may be granted in a civil tribal proceeding. We disagree. In *Poodry*, the petitioners were convicted of "treason" and sentenced to banishment from the Tonawanda Reservation. *Poodry*, 85 F.3d at 876. The specific

---

[2]The dissent points to *Duncan v. Walker*, 533 U.S. 167 (2001), to support the argument that habeas is available in civil actions as well as criminal. We disagree with this characterization of *Duncan*. *Duncan* was addressing the one year limitation period under the Antiterrorism and Effective Death Penalty Act (AEDPA). Specifically, the Court in *Duncan* was discussing what qualifies as "in custody" under AEDPA for purposes of calculating the time limit. *Id.* at 176. The Court noted that some civil actions (such as commitment to a mental institution and civil contempt, *id.*) "may" satisfy this custody requirement. *Id.* We do not find that this precedent bears on whether ICRA habeas petitions are available in civil proceedings.

issue addressed in *Poodry* was whether § 1303 of the ICRA "allows a federal court to review punitive measures imposed by a tribe upon its members, when those measures involve 'banishment' rather than imprisonment." *Id.* at 879. The Second Circuit performed an extensive analysis of whether a habeas petition could be brought in a civil context, but ultimately stated, "[b]ecause we conclude the tribal action in this case indeed arose in a criminal context, we ultimately need not resolve the question of whether habeas review is restricted to cases involving a tribal criminal conviction." *Id.* at 888. Therefore, any citation to *Poodry* for the proposition that habeas relief may be granted from a civil tribal proceeding would be dicta.

The allegations in *Quair I* were also criminal in nature. In fact, the court in *Quair I* found that petitioners seeking relief under § 1303 must establish that the proceeding at issue is criminal and not civil in nature. *Quair I*, 359 F. Supp. 2d at 963. These decisions, therefore, do not support Appellants' position that habeas relief may be granted from a civil tribal proceeding.

**[14]** Because the extension of habeas relief to civil proceedings would circumvent tribal sovereignty and cause undue or precipitous interference with matters such as enrollment, we hold that Appellants in this case are not eligible for relief under the ICRA habeas provision.

## III.  CONCLUSION

The district court properly dismissed Appellants' action for lack of subject matter jurisdiction. Appellants were not detained, did not exhaust their tribal remedies, and their disenrollment was the result of a civil proceeding. Therefore, they cannot get relief under the habeas corpus provision of the ICRA. Accordingly, we affirm the district court.

**AFFIRMED.**

Wilken, District Judge, dissenting:

Appellants, enrolled members of the Pechanga Tribe since birth, filed a petition for a writ of habeas corpus under the Indian Civil Rights Act (ICRA) asserting that their Tribal Council violated the due process, equal protection, free speech and cruel and unusual punishment clauses of the Act when it stripped them of membership in the Tribe. The membership criteria that the Tribal Council applied were not established until 1979; the procedures it used to disenroll Tribal members were not established until 1988; and the Tribal Council did not begin disenrolling large numbers of members until recently, when the Tribe's casino profits became a major source of revenue.[1] Appellants allege that they are victims of the Tribal Council's greed associated with these casinos.

The majority concludes that the district court properly dismissed Appellants' petition for lack of subject matter jurisdiction because Appellants (1) were disenrolled as the result of a civil proceeding, (2) were not detained and (3) did not exhaust their Tribal remedies. I respectfully dissent and address each argument in turn.

I.   Indian Civil Rights Act (ICRA)

Beginning in 1961, through hearings and surveys, Congress commenced an investigation into the conduct of tribal governments due to abuses that some tribal members were enduring at the hands of tribal officials. In 1968, Congress enacted ICRA to protect against such abuses by imposing restrictions upon tribal governments similar to those contained in the Bill of Rights and the Fourteenth Amendment. The enforcement mechanism Congress provided was that of habeas corpus in federal courts. 25 U.S.C. § 1303. A central purpose of ICRA was to " 'secur[e] for the American Indian the broad constitu-

---

[1]At the time of Appellants' disenrollment, every adult Pechangan received a per capita benefit of over $250,000 per year.

tional rights afforded to other Americans,' and thereby to 'protect individual Indians from arbitrary and unjust actions of tribal governments.' " *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 61 (1978) (quoting S. Rep. No. 841, 90th Cong., 1st Sess., 5-6 (1967)).

## A.    Criminal v. Civil Action

I disagree with the majority's view that ICRA provides a federal court with jurisdiction to review only a tribal criminal proceeding, not a civil proceeding.

The plain language of § 1303 does not limit the court's habeas jurisdiction to criminal proceedings. Section 1303 simply provides, "The privilege of the writ of habeas corpus shall be available to any person, in a court of the United States, to test the legality of his detention by order of an Indian tribe."

In other contexts, the writ of habeas corpus has historically been available to contest detention resulting from civil proceedings. *See, e.g.*, *Rex v. Clarkson*, 1 Strange 444 (K.B. 1720); *Gegiow v. Uhl*, 239 U.S. 3 (1915). The Supreme Court has held more recently that nothing in the language of the provisions for federal habeas relief for a person in custody pursuant to the judgment of a state court "requires that the state court judgment pursuant to which a person is in custody be a criminal conviction." *Duncan v. Walker*, 533 U.S. 167, 176 (2001). As examples, the Court cited cases in which federal courts had applied federal habeas review to petitions brought "to challenge the legality of a state court order of civil commitment or a state court order of civil contempt." *Id.* (citations omitted). No reason appears in the plain language of § 1303 to give it a narrower "reach than [the] cognate statutory provisions governing collateral review of state and federal action[s]." *Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d 874, 879-80 (2d Cir. 1996), *cert. denied*, 519 U.S. 1041 (1996).

The majority relies primarily on *Santa Clara Pueblo* to support its conclusion. In that case, a female member of the Santa Clara Pueblo Indian tribe and her daughter brought suit in federal court against the tribe and its governor seeking declaratory and injunctive relief against enforcement of a tribal ordinance denying membership in the tribe to children of female members who marry outside the tribe, while extending membership to children of male members who marry outside the tribe.

The issue before the Supreme Court in *Santa Clara* was whether ICRA could be "interpreted to impliedly authorize" the "bringing of civil actions for declaratory or injunctive relief to enforce its substantive provisions." *Santa Clara*, 436 U.S. at 51-52. The Court held that it could not.

The Court stated that its holding was "strongly reinforced by the specific legislative history underlying 25 U.S.C. § 1303." *Id.* at 66. As part of its discussion of the legislative history, the Court explained that Congress had considered and rejected two proposals that would have allowed for "federal review of alleged violations of the Act arising in a civil context." *Id.* at 67. One of these proposals would have required the Attorney General to prosecute deprivations of an Indian's statutory or constitutional rights and the other would have authorized the Department of the Interior to adjudicate civil complaints concerning tribal actions. *Id.* at 67-68. While Congress rejected these two particular proposals, the legislative history does not indicate that it rejected any possible review of civil proceedings, and the Court did not so find.

The Court also noted, "In settling on habeas corpus as the exclusive means for federal-court review of tribal criminal proceedings, Congress opted for a less intrusive mechanism than had been initially proposed." *Id.* at 67. (The initial proposal to which the Court referred here would have allowed for de novo review in federal court of all convictions in tribal courts.) From the premise that habeas corpus is the exclusive

means for review of criminal proceedings, it does not follow as a matter of logic or grammar that habeas corpus is a means that can be used to review criminal proceedings exclusively. In other words, the Court's statement does not preclude habeas review of civil proceedings that result in detention. The Court held only that habeas corpus, and not any other federal remedy such as a direct appeal, is provided by ICRA. The Court had no need to, and did not, decide that habeas jurisdiction under ICRA applied only to criminal proceedings. Such is the Second Circuit's interpretation of the case: "*Santa Clara Pueblo* obviously does not speak directly to the scope of Title I's habeas provision, which was a matter not raised in that case." *Poodry*, 85 F.3d at 887. In *Poodry*, the Second Circuit also found that "it is not possible to draw from [ICRA's] legislative history a definitive conclusion as to whether Congress intended that habeas review be restricted to criminal convictions, or whether other circumstances of 'detention' by a tribal court order could trigger habeas review." *Id.* at 888.

The fact that the challenged proceedings in the case before us were civil, not criminal, does not, in my view, bar the district court from hearing the matter under § 1303.

B.   Detention

"Detention" by order of an Indian tribe is the sole jurisdictional prerequisite for federal habeas review. The requirement in § 1303 that an individual be "detained" is akin to the "in custody" and "detention" requirement in other habeas statutes. *Poodry*, 85 F.3d at 891 ("Congress appears to use the terms 'detention' and 'custody' interchangeably in the habeas context."). The habeas statutes analogous to § 1303 refer to "detention" as well as "in custody" throughout. *See* 28 U.S.C. §§ 2242, 2243, 2245, 2249, 2253 and 2255. "There is no reason to conclude that the requirement of 'detention' set forth in the Indian Civil Rights Act § 1303 is any more lenient than the requirement of 'custody' set forth in the other federal

habeas statutes." *Moore v. Nelson*, 270 F.3d 789, 791 (9th Cir. 2001). Nor is there any reason to conclude that the requirement of "detention" in § 1303 is any more strict than the requirement of "custody" or "detention" in the other federal habeas statutes.

The custody or detention requirement may be met if the habeas petitioner is not physically confined. *Jones v. Cunningham*, 371 U.S. 236, 239-40 (1963); *see Dow v. Court of the First Circuit Through Huddy*, 995 F.2d 922, 923 (9th Cir. 1993) (per curiam) (holding that a requirement to attend fourteen hours of alcohol rehabilitation constituted custody; requiring petitioner's physical presence at a particular place "significantly restrain[ed] [his] liberty to do those things which free persons in the United States are entitled to do"), *cert. denied*, 510 U.S. 1110 (1994).

This requirement is designed to limit the availability of habeas review "to cases of special urgency, leaving more conventional remedies for cases in which the restraints on liberty are neither severe nor immediate." *Hensley v. Mun. Court*, 411 U.S. 345, 351 (1973). Therefore, the inquiry into whether a petitioner has satisfied the jurisdictional prerequisites for habeas review requires a court to judge the "severity" of an actual or potential restraint on liberty.

The combination of the current and potential restrictions placed upon Appellants and the loss of their life-long Pechanga citizenship constitutes a severe restraint on their liberty. The majority analyzes each of these grounds separately, instead of collectively, and determines that none amounts to a detention. I respectfully disagree with this approach.

When Tribal members are disenrolled, they become "non-members" of the Tribe and lose all rights associated with being a Pechanga citizen. One of those rights is access to the Pechanga Reservation. The Pechanga Non-Member Reservation Access and Rental Ordinance (Reservation Access Ordi-

nance) states, "The custom, tradition and practice of the Pechanga Band has always been, and remains, that the Pechanga Reservation is closed to non-members. Access to and residency within the Pechanga Reservation is a privilege which may be granted or denied to an individual upon proper authority of the Pechanga Band."

Elsewhere, the Reservation Access Ordinance provides, "Use by non-members of roads within the Pechanga Reservation is . . . by permission of the Tribal Council and is subject to revocation at any time and for any reason." The Ordinance establishes that a non-member may enter the Pechanga Reservation only upon invitation by the Tribal Council or by an enrolled member of the Pechanga Band. Otherwise, access to the Pechanga Reservation by non-members is prohibited.

Since being disenrolled, Appellants have been excluded from the school, the health clinic and the senior citizens' facilities on the Reservation. Some of the Appellants live on the Reservation. Although they may enter the Reservation and travel to their homes, any Tribal Ranger can take away that liberty at any moment.

Pechanga Tribal Rangers have the authority and discretion summarily to exclude non-members from the Pechanga Reservation for up to seven days for any of the following reasons:

   (1)   suspicion that a non-member has committed a violation of any applicable tribal, state or federal law within the Pechanga Reservation;

   (2)   suspicion that a non-member is a danger to himself, herself or others;

   (3)   a finding by a Tribal Ranger that a non-member is a public nuisance; or

   (4)   any behavior which is suspicious or not consistent with a legitimate visit either to a tribal

enterprise for business or patronage purposes, or to the home of a resident of the Pechanga Indian Reservation by invitation and in compliance with the Non-Member Reservation Access and Rental Ordinance.

Thus, a parent could, without warning, be barred from going home for a week by a Tribal Ranger who observes "any behavior that is suspicious." That Appellants have not been removed thus far does not render them free or unrestrained. Appellants may currently be able to "come and go" as they please, *cf. Hensley*, 411 U.S. at 351, but their current status as non-members living on the Pechanga Reservation means that at any point they may be compelled to "go," and be no longer welcome to "come." That is a severe restraint to which the members of the Pechanga Band are not generally subject. *See id.*

The majority analogizes the severe restraint Appellants confront with that in a case involving a twenty-five dollar fine. *Edmunds v. Won Bae Chang*, 509 F.2d 39, 41 (9th Cir. 1975). In that case, the court held that Edmunds was not subjected to a severe restraint because there was "no provision in the sentence for his confinement in the case of non-payment." *Id.* The court generally observed that "a threat of incarceration is implicit in any court-imposed fine, for jail is one of the sanctions by which courts enforce their judgments and orders." However, in the circumstances of *Edmunds*, "confinement [was] no more than a speculative possibility — 'the unfolding of events may render the entire controversy academic.' " *Id.* (quoting *Hensley*, 411 U.S. at 352). Analogizing the current and potential penalties involved in this case with a twenty-five dollar fine and the speculative possibility that failure to pay the fine may result in judicial proceedings leading to confinement trivializes the severity of Appellants' situation.

Furthermore, Appellants have been stripped of their life-long Pechanga citizenship, which by itself constitutes a severe

deprivation. A deprivation of citizenship is "an extraordinarily severe penalty" with consequences that "may be more grave than consequences that flow from conviction for crimes." *Klapprott v. United States*, 335 U.S. 601, 611-12 (1949). The Supreme Court has found the penalty of denationalization of a natural-born citizen, sought to be imposed after conviction for military desertion, to be unconstitutional. *See Trop v. Dulles*, 356 U.S. 86, 104 (1958).

> It is a form of punishment more primitive than torture, for it destroys for the individual the political existence that was centuries in the development.
>
> . . . .
>
> This punishment is offensive to cardinal principles for which the Constitution stands. It subjects the individual to a fate of ever-increasing fear and distress. He knows not what discriminations may be established against him, what proscriptions may be directed against him, and when and for what cause his existence in his native land may be terminated. He may be subject to banishment, a fate universally decried by civilized people. . . . It is no answer to suggest that all the disastrous consequences of this fate may not be brought to bear on a stateless person. The threat makes the punishment obnoxious.

*Id.* at 101-102. A "deprivation of citizenship does more than merely restrict one's freedom to go or remain where others have the right to be: it often works a destruction of one's social, cultural, and political existence." *Poodry*, 85 F.3d at 897. Although with disenrollment Appellants retain their United States citizenship and will not be physically stateless, they have been stripped of their life-long citizenship and identity as Pechagans. This is more than just a loss of a label, it is a loss of a political, ethnic, racial and social association. William C. Canby, Jr., *American Indian Law in a Nut Shell*

§§ III.B-C (5th ed. 2009); Felix S. Cohen, *Handbook of Federal Indian Law* § 3.03 (2005). Such a loss constitutes a restraint on liberty that, combined with the actual and potential restraints described above, satisfies the detention requirement under § 1303, in my opinion.

### C. Exhaustion

The majority concludes that we lack jurisdiction over any claims for exclusion or eviction because Appellants have not exhausted their Tribal remedies for such claims or demonstrated that exhaustion would be futile. But Appellants are not asserting jurisdiction based on any exclusion or eviction from the Pechanga Reservation. Rather, Appellants' claim of jurisdiction is based on the restraints on their liberty arising from being disenrolled and threatened with exclusion. Notably, the parties agree that Appellants have completed the internal Tribal appeal process for challenging disenrollment. Further, there does not appear to be any remedy available to Appellants if they were to be given a seven-day exclusion without warning. Appellants have exhausted their claims and their habeas petition is ripe for adjudication.

### II. Conclusion

When viewed together, the act of stripping Appellants' Tribal citizenship and the current and potential restrictions placed upon Appellants constitute a severe restraint on their liberty. Therefore, Appellants have been detained within the meaning of § 1303. Accordingly, I would reverse and remand to the district court to hear their petition for a writ of habeas corpus on its merits.