WARDLAW, Circuit Judge,
concurring in part and dissenting in part:
I agree with the majority that we lack habeas jurisdiction over the UAIC’s withholding orders, and that the expired two-year banishment orders against Dolly and Barbara Suehead and Dona Caesar should be dismissed as moot. However, I conclude that Jessica Tavares’s ten-year banishment order severely restrains her liberty and constitutes “detention” under the Indian Civil Rights Act (“ICRA”). Therefore, I respectfully disagree with the majority’s holding that we lack jurisdiction to entertain her habeas petition.
Tavares is a longtime leader of the UAIC. She served on the Tribal Council from approximately 1998 to 2010; for many of these years, she was Council Chair. In 2011, Tavares helped to organize a campaign to remove certain Tribal Council members from office for malfeasance, alleging financial misdealings and corruption related to tribal elections. Notwithstanding Tavares’s right to free expression,[1] the tribe accused her of making “misrepresentations against the Tribe” and “defaming [its] reputation” in violation of tribal law.
In retaliation, the tribe informed Ta-vares that she was henceforth “banned from tribal lands and facilities, for a period of ten (10) years, due to [her] repeated and serious violations of tribal law, effective November 15, 2011.”[2] The tribe’s order further specified that Tavares was “banned from attending any tribally sponsored events and/or entering all Tribal properties and/or surrounding facilities, *879 which includes, but is not limited to the Tribal Offices, Thunder Valley Casino, the UAIC School, Health and Wellness facilities at the Ranchería, and/or the Park- at the Ranchería.” The restraint on Tavares’s individual liberty is obvious: she cannot set foot on her tribe’s reservation.
The district court was correct to recognize that “the restraint in this case was severe.” Tavares v. Whitehouse, No. 2:13-CV-02101-TLN, 2014 WL 1155798, at *10 (E.D. Cal. Mar. 21, 2014). Having so found, it should have exercised jurisdiction over her habeas petition pursuant to 25 U.S.C. § 1303.[3]
I.
A.
“As separate sovereigns pre-existing the Constitution, tribes have historically been regarded as unconstrained by those constitutional provisions framed specifically as limitations on federal or state authority.” Santa Clara Pueblo v. Martinez, 436 U.S. 49, 56, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978). However, “Congress has plenary authority to limit, modify or eliminate the powers of local self-government which the tribes otherwise possess.” Id. “Title I of the ICRA, 25 U.S.C. §§ 1301-1303, represents an exercise of that authority.” Id. at 57, 98 S.Ct. 1670.
Congress enacted the ICRA in 1968 “to insure that the American Indian is afforded the broad constitutional rights secured to other Americans.” S. Rep. No. 90-841, at 6 (1967). A “central purpose of the ICRA” was to “‘protect individual Indians from arbitrary and unjust actions of tribal governments.’ ” Santa Clara Pueblo, 436 U.S. at 61, 98 S.Ct. 1670 (quoting S. Rep. No. 90-841, at 5-6). Accordingly, the ICRA “impostes] certain restrictions upon tribal governments similar, but not identical, to those contained in the Bill of Rights and the Fourteenth Amendment.” Id. at 57, 98 S.Ct. 1670; see also 25 U.S.C. § 1302. The rights enumerated in § 1302 do not contain implied causes of action. Santa Clara Pueblo, 436 U.S. at 51-52, 72, 98 S.Ct. 1670. But Congress provided an explicit cause of action to protect the rights that it chose to grant to the American Indian: the “privilege of the writ of habeas corpus.” 25 U.S.C. § 1303.
Though narrow, this claim for relief is firmly established. See Boe v. Fort Belknap Indian Cmty., 642 F.2d 276, 278-79 (9th Cir. 1981) (describing 25 U.S.C. § 1303 as “[t]he only avenue available to a party who seeks relief in the federal courts for an alleged violation of the ICRA”). Of course, recognizing the “well-established federal policy of furthering Indian .self-government,” Santa Clara Pueblo, 436 U.S. at 62, 98 S.Ct. 1670 (internal quotation marks omitted), we “should not rush to create causes of action” that would intrude upon tribes’ inherent sovereignty, id. at 72 n.32, 98 S.Ct. 1670. But we are not asked to “create causes of action” in this case; we are asked to apply the only law by which Indians may vindicate their ICRA rights — the congressionally granted right to petition for habeas relief.
Tavares presents us with precisely the kind of case over which Congress intended to establish federal jurisdiction: having exercised her right to free expression which Congress, through the ICRA, had explicitly guaranteed her, Tavares suffered retaliation from the UAIC in the form of “severe restraints on individual liberty” not shared by other members of her tribe. *880 Poodry v. Tonawanda Band of Seneca Indians, 85 F.3d 874, 894 (2d Cir. 1996) (internal quotation marks omitted). “[R]e-straints on a [person’s] liberty ... not shared by the public generally ... have been thought sufficient in the English-speaking world to support the issuance of habeas corpus.” Jones v. Cunningham, 371 U.S. 236, 240, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963). This is the trigger for jurisdiction that Congress designed. We should acknowledge our congressionally mandated jurisdiction and exercise our duty to adjudicate Tavares’s petition, as Congress intended when it balanced Indian sovereignty against individual rights in the ICRA. It is not our place to recalibrate that balance.
B.
“The term ‘detention’ in the [ICRA] statute must be interpreted similarly to the ‘in custody* requirement in other habe-as contexts.” Jeffredo v. Macarro, 599 F.3d 913, 918 (9th Cir. 2009). Reflecting this principle, the bodies of law construing the “detention” and “custody” requirements are interdependent. Just as habeas courts applying the ICRA rely on authorities construing “custody” in general habeas contexts, courts in general habeas contexts rely on authorities construing “detention” under the ICRA. For instance, the Third Circuit concluded in a non-ICRA case that a person sentenced to perform five hundred hours of community service was “in custody,” relying in part on the Second Circuit’s analysis of “detention” in an ICRA case. Barry v. Bergen Cty. Prob. Dep’t, 128 F.3d 152, 161 (3d Cir. 1997) (discussing Poodry, 85 F.3d at 894-95).
■ The majority holds that “detention” as used in the ICRA is “understood as a subset of custody.” Maj. Op. 871. The majority suggests that the absence of the word “custody” from 25 U.S.C. § 1303 is significant because, by contrast, the word “custody” is used in “every section” of federal habeas statutes 28 U.S.C. §§ 2241(c)(1) — (4), 2254(a), and 2255(a). However, the word “detention” also appears frequently throughout other sections of the federal habeas statutes. See 28 U.S.C. §§ 2245, 2249, 2253 (referring to “detention” only); §§ 2241, 2242, 2243, 2244, 2255 (referring to both “detention” and “custody,” apparently interchangeably); cf. §§ 2252, 2254 (referring to “custody” only). There is no indication in any part of any section that the terms might have distinct meanings: if anything, the statutes suggest, as a whole, that “detention” and “custody” are interchangeable. This is why the Poodry court declined to differentiate between “detention” and “custody,” stating,
We find the choice of language unremarkable in light of references to “detention” in the federal statute authorizing a motion attacking a federal sentence, see § 2255, as well as in the procedural provisions accompanying § 2241, see §§ 2242, 2243, 2244(a), 2245, 2249, 2253. Congress appears to use the terms “detention” and “custody” interchangeably in the habeas context. We are therefore reluctant to attach great weight to Congress’s use of the word “detention” in § 1303.
85 F.3d at 890-91.
Reliance upon legislative history is unnecessary to supplement our statutory analysis. See Nw. Forest Res. Council v. Glickman, 82 F.3d 825, 830-31 (9th Cir. 1996), as amended on denial of reh’g (May 30, 1996) (“In interpreting a statute, we look first to the plain language of the statute, construing the provisions of the entire law, including its object and policy, to ascertain the intent of Congress. Then, if the language of the statute is unclear, we look to its legislative history.” (internal quotation marks omitted)). But to the ex *881 tent that legislative history is relevant, it supports our exercise of jurisdiction to entertain Tavares’s habeas petition.
The limited legislative history available suggests that “detention” and “custody” are interchangeable terms in the habeas context. The language of § 1303 “closely tracks the language of Colliflower v. Garland, 342 F.2d 369 (9th Cir. 1965)[, overruled on other grounds by United States v. Wheeler, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978), as recognized by Davis v. Muellar, 643 F.2d 521, 532 n.13 (8th Cir. 1981)].” Poodry, 85 F.3d at 891. In Colliflower, we relied on the broad scope of the general federal habeas statutes to conclude that “it is competent for a federal court in a habeas corpus proceeding to inquire into the legality of the detention of an Indian pursuant to an order of an Indian court.” 342 F.2d at 379. Observing that Congress “frequently invoked ['Colliflower] with approval during the 1965 [Subcommittee on Constitutional Rights of the' Senate Judiciary Committee] hearings” that preceded the ICRA’s enactment, the Second Circuit concluded that Congress intended the ICRA’s habeas provision to be as broad as, but “no broader than,” its federal counterparts.[4] Poodry, 85 F.3d at 891, 893.
The majority opinion highlights two pieces of history from the ICRA’s enaetment to support its contrary position, but neither is persuasive. First, the majority contends that a memorandum prepared by the House of Representatives Committee on the Judiciary supports its conclusion because the memorandum describes the function of § 1303 with a single reference to “tribal detention,” not “custody.” 114 Cong. Rec. 9611 (1968). But the memorandum is not an analytical discussion of Congress’s word choice of “detention” in the statute. It is merely a brief summary of § 1303; indeed it is unsurprising that the memorandum mirrors the statutory language. The entirety of the excerpt dedicated to the whole of the ICRA’s provision of individual rights — of which § 1303 was but one part — is barely 150 words long. See id. Like the Second Circuit, I am “therefore reluctant to attach great weight to Congress’s use of the word ‘detention’ in §' 1303.” Poodry, 85 F.3d at 891.
Second, the majority speculates that Representative Reifel’s remarks on the floor of the House show that the ICRA’s habeas provision was intentionally circumscribed to rights associated with criminal trials. Representative Reifel noted that the provision of a federal habeas forum in § 1303 would “assure effective enforcement of [the] fundamental rights” enumerated in the ICRA. 114 Cong. Rec. 9553 (1968). Those include not only protections associated with criminal trials, see 25
*882 U.S.C. § 1302(a)(3)-(10), but also the ICRA’s analogues to the First and Fourth Amendments, see § 1302(a)(l)-(2). Thus, Representative Reifel’s commentary does not support the majority’s argument that § 1303 is limited only to rights associated with criminal trials. In any case, Representative Reifel’s brief remarks do not illuminate any purported nuances distinguishing “detention” from “custody”; his comments are irrelevant to our analysis of the language. Congress chose when it enacted § 1303.
Ü
To reach its holding that detention m the ICRA is narrower than “custody” in the general habeas statutes, the majority relies heavily upon Poodry's phrasing that 25 U.S.C. § 1303 “is no broader than analogous statutory provisions for collateral relief.” 85 F.3d at 893 (emphasis added). But Poodry used the phrase “no broader” specifically because two courts — including ours — had previously held that “detention” in the ICRA was broader than “custody” in the non-ICRA context. See Settler v. Yakima Tribal Court (“Settler 7”), 419 F.2d 486, 489-90 (9th Cir. 1969), abrogated by Santa Clara Pueblo, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106, and Hensley v. Mun. Court, 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973), as recognized by Moore v. Nelson, 270 F.3d 789, 791-92 (9th Cir. 2001); Tracy v. Superior Court, 168 Ariz. 23, 810 P.2d 1030, 1049 (1991) (en banc). In both cases, the courts noted that a person subjected to a fine only is under “detention” for purposes of § 1303, even though a fine alone would not bring that person within the jurisdiction of the general federal habeas statutes.[5] Thus Poodry reined in the meaning of “detention” to the outer limits of custody, but it did not suggest that “detention” was any narrower than “custody.” Poodry provides no support for the majority opinion’s novel holding that an American Indian may be in “custody” for purposes of the general ha-beas statutes, but not in “detention” for purposes of the ICRA’s habeas statute.
We actually have binding precedent to the contrary, which the majority opinion fails to acknowledge. It is the law of bur Circuit that “[t]he term ‘detention’ in the [ICRA] statute must be interpreted similarly to the ‘in custody’ requirement in other habeas contexts.” Jeffredo, 599 F.3d at 918; see also Boozer v. Wilder, 381 F.3d 931, 934 n.2 (9th Cir. 2004) (“Detention [as used in 25 U.S.C. § 1303] is interpreted with reference to custody under other federal habeas provisions.”); Moore, 270 F.3d at 791-92 (9th Cir. 2001) (relying on habeas cases interpreting custody to analyze detention under the ICRA); cf. Mills v. Taylor, 967 F.2d 1397, 1400 (9th Cir. 1992) (affirming a grant of habeas corpus, in part because the panel “conclude[d] that Congress intended no change in meaning when it substituted ‘detention’ for ‘custody’ [in 18 U.S.C. § 3585]”).
Morever, the majority splits from every other federal appellate court to have addressed this question. The Second Circuit recognizes that “Congress appears to use the terms ‘detention’ and ‘custody’ interchangeably in the habeas context.” Poo-dry, 85 F.3d at 891. The Tenth Circuit “readfs] the ‘detention’ language as being analogous to the ‘in custody’ requirement contained in 28 U.S.C. § 2241.” Dry v. CFR Court of Indian Offenses, 168 F.3d 1207, 1208 n.1 (10th Cir. 1999); see also Valenzuela v. Silversmith, 699 F.3d 1199, 1203 (10th Cir. 2012); Walton v. Tesuque *883 Pueblo, 443 F.3d 1274, 1279 n.1 (10th Cir. 2006). And the Sixth Circuit recognizes that “habeas claims brought under the Indian Civil Rights Act, 25 U.S.C. § 1303, are most similar to habeas actions arising under 28 U.S.C. § 2241,” § 1303’s “federal law analogue.” Kelsey v. Pope, 809 F.3d 849, 854 (6th Cir. 2016), cert. denied sub nom. Kelsey v. Bailey, — U.S. -, 137 5.Ct. 183, 196 L.Ed.2d 150 (2016).
II.
Half a century ago, the Supreme Court made clear that a habeas petitioner is in “detention” or “custody” when she is subjected to severe restraints on liberty that need not rise to the level of physical confinement. The Court declared, “History, usage, and precedent can leave no doubt that, besides physical imprisonment, there are other restraints on a man’s liberty, restraints not shared by the public generally, which have been thought sufficient in the English-speaking world to support the issuance of habeas corpus.” Jones, 371 U.S. at 240, 83 S.Ct. 373. Ever since, the Court consistently has “very liberally construed the ⅛ custody’ requirement for purposes of federal habeas.” Maleng v. Cook, 490 U.S. 488, 492, 109 S.Ct. 1923, 104 L.Ed.2d 540 (1989) (per curiam).[6] For our part, we faithfully have applied the Court’s instructions to our cases, recognizing that a habeas petitioner need only show “that he is subject to a significant restraint upon his liberty” for our jurisdiction to obtain. Wilson v. Belleque, 554 F.3d 816, 822 (9th Cir. 2009).
In determining whether a habeas petitioner is “in custody,” the Supreme Court has “reified] heavily on the notion of a physical sense of liberty — that is, whether the legal disability in question somehow limits the putative habeas petitioner’s movement.” Williamson v. Gregoire, 151 F.3d 1180, 1183 (9th Cir. 1998). In Jones v. Cunningham, the Supreme Court held that conditions of parole satisfied the custody requirement where the parolee was required to remain in a particular community, make periodic reports to a parole officer, and refrain from visiting certain places. 371 U.S. at 242-43, 83 S.Ct. 373. The Court also has held that an individual released on his own recognizance pending sentencing after conviction is “in custody” because he must appear at times and places ordered by the court and “cannot come and go as he pleases.” Hensley, 411 U.S. at 351, 93 S.Ct. 1571; see also, e.g., Justices of Boston Mun. Court v. Lydon, 466 U.S. 294, 301, 104 S.Ct. 1805, 80 L.Ed.2d 311 (1984). Similarly, we have held that a petitioner required to log “fourteen hours of attendance at an alcohol rehabilitation program” was “in custody” because the sentence required the petitioner’s “physical presence at a particular place,” which “significantly restrainfed] [his] liberty to do those things which free persons in the United States are entitled to do.” Dow v. Circuit Court, 995 F.2d 922, 922-23 (9th Cir. 1993) (per curiam).[7] In *884 these instances, the petitioner was “in custody” for purposes of habeas jurisdiction because the restraints on his physical liberty were “not shared by the public generally.” Jones, 371 U.S. at 240, 88 S.Ct. 373. It is clear that such restraints need not rise to the level of actual confinement for habeas jurisdiction to attach.[8]
As with “custody,” the restraint on physical liberty is the essence of “detention” under the ICRA. Thus, in Means v. Navajo Nation, 432 F.3d 924 (9th Cir. 2005), we held that a petitioner was in “detention” for ICRA purposes when the conditions of pretrial release barred the petitioner from going within one hundred yards of his former father-in-law’s home and required him to appear as scheduled before the trial court. Id. at 928 (citing Lydon, 466 U.S. at 300-02, 104 S.Ct. 1805, and Hensley, 411 U.S. at 351-52, 93 S.Ct. 1571). Similarly, in Settler v. Lameer (“Settler II”), 419 F.2d 1311, 1312 (9th Cir. 1969) (per curiam), we held that despite the lack of physical confinement, petitioners released on bail satisfied the ICRA’s detention, requirement. See also Moore, 270 F.3d at 791 (“Bail status clearly restricts liberty - in a way that a purely monetary fine does not; the petitioner ‘cannot come and go as he pleases.’ ” (quoting Hensley, 411 U.S. at 351, 93 S.Ct. 1571)). Consistent with the Supreme Court’s construction of the “custody” requirement under federal habeas law, we have made physical liberty the focal point of our analysis of “detention” under the ICRA.
III.
A.
Banishment is a uniquely severe punishment. It does “more than merely restrict one’s freedom to go or remain where others have the right to be: it often works a destruction of one’s social, cultural, and political existence.” Poodry, 85 F.3d at 897. Tavares’s ten-year banishment is not “a modest fine or a short suspension of a privilege ... but [rather] the coerced and peremptory deprivation of [her] membership in the tribe and [her] social and cultural affiliation.” Id. at 895. For these reasons, “[b]anishment has generally been held to satisfy the ‘in custody’ requirement” of the general habeas laws. Cohen’s Handbook of Federal Indian Law § 9.09, 780-81 (Nell Jessup Newton ed., 2012) (“Cohen’s”). Whether under the law of our circuit or that of any other to consider the issue, Tavares’s banishment places her in “custody”; thus, she is in “detention.”
The majority asserts that three cases about the limits of detention under § 1303 inform its analysis: Poodry v. Tonawanda Band of Indians, 85 F.3d 874; Shenandoah v. United States Department of Interior, 159 F.3d 708 (2d Cir. 1998); and *885 Jeffredo v. Macarro, 599 F.3d 913. But only one of these cases, Poodry, squarely addresses the legal principles animating this case. Neither Shenandoah nor Jeffre-do pertains to banishment. To the contrary, they are explicitly not about banishment. The Shenandoah petitioners did “not allege[ ] that they were banished from the Nation, ... or that defendants attempted in anyway [sic] to remove them from [tribal] territory.” 159 F.3d at 714. Similarly, the Jeffredo petitioners “ha[d] not been banished” and “[t]heir movements ha[d] not been restricted on the Reservation.” 599 F.3d at 919. Only Poo-dry’s holding bears upon the case before us, and it supports a finding of jurisdiction over Tavares’s petition.
In Poodry, several members of the To-nawanda Band of Seneca Indians filed a petition for habeas relief under 25 U.S.C. § 1303 after they were ordered permanently banished from the tribe. The petitioners had accused members of the Tona-wanda Council of Chiefs of misusing tribal funds, suspending tribal elections, burning tribal records, and other misconduct. Poo-dry, 85 F.3d at 877-78. Several months later, the petitioners were accosted at their homes by groups of fifteen to twenty-five persons, summarily convicted of “treason,” and issued orders of permanent banishment. Id. at 878-79. The orders read in part, “You are to leave now and never return.... [Y]our name is removed from the Tribal rolls, your Indian name is taken away, and your lands will become the responsibility of the Council of Chiefs. You are now stripped of your Indian citizenship and permanently lose any and all rights afforded our members. YOU MUST LEAVE IMMEDIATELY AND WE WILL WALK WITH YOU TO THE OUTER BORDERS OF OUR TERRITORY.” Id. at 876 (alteration in original). When the petitioners refused to leave the reservation, they suffered continued harassment, were assaulted, and were denied electrical service to their homes and businesses. Id. at 878
The Poodry petitioners filed for writs of habeas corpus under § 1303, claiming they had been denied several rights guaranteed under Title I of the ICRA. Id. at 879. The Western District of New York dismissed their petitions for lack of subject-matter jurisdiction, holding that banishment did not constitute “detention” for the purposes of § 1303. Id. The Second Circuit reversed, concluding that where a tribal member has been banished rather than imprisoned, “[T]he ICRA’s habeas provision [nevertheless] affords the petitioners access to a federal court to test the legality of their ‘convictfion]’ and subsequent ‘banishment’ from the reservation and ... therefore [the district court] erred in dismissing the petitions for writs of habeas corpus on jurisdictional grounds.” Id. (second alteration in original).[9] In particular, *886 the Second Circuit held that the scope of § 1303 is equivalent to that of the general federal habeas statutes, and that therefore the petitioners’ banishment orders satisfied the “detention” requirement of § 1303. Id. at 890-97. It follows from Poo-dry that Tavares’s banishment also constitutes “detention” under the ICRA.
In contrast, Jeffredo, the only case until today to raise the scope of the meaning of the term “detention” in § 1303 before our Court, does not support the majority’s holding. In Jeffredo, a tribe disenrolled several members “for failing to prove their lineal descent as members of the Tribe.” 599 F.3d at 915. We held that the disen-rollment ,of the petitioners, whose “movements [had] not been restricted on the Reservation,” did not constitute “detention” under the ICRA. Id. at 919. Specifically, we noted that “[djisenrollment does not mean that a person is banished from the [tribe’s] Reservation,” and that the habeas petitioners in that case “ha[d] not been banished from the Reservation.” Id. at 916, 919. This case presents the inverse fact pattern: Tavares was not disenrolled from her tribe, but she has been banished — her movements are restricted on the reservation. Jeffredo was about membership, not physical liberty; this case is about physical liberty, not membership. Because Jeffredo is not a case about banishment, our decision to decline jurisdiction in that case does not govern us here. See also Moore, 270 F.3d at 790-91 (recognizing that a tribal member who was “subjected to a fine” but who “ha[d] not been excluded or otherwise restricted in his movements on the Reservation” was not in detention under the ICRA).
The majority opinion extends Jeffredo from disenrollment decisions to temporary exclusion orders because, according to the majority, the latter are merely “another expression of [the tribe’s] sovereign immunity to determine the makeup of the community.” Maj. Op. 876. This reasoning sweeps too broadly and occludes the distinct driving principles behind Jeffredo and this case.
First, a tribe’s decision to disenroll members based on their “lineal descent” implicates the “ ‘tribe’s right to define its own membership for tribal purposes,’ ” which “ ‘has long been recognized as central to its existence as an independent political community.’ ” Jeffredo, 599 F.3d at 917-18 (quoting Santa Clara Pueblo, 436 U.S. at 72 n.32, 98 S.Ct. 1670). Here, because Tavares does not challenge any membership decision of her tribe, her petition does not raise Jeffredo’s animating concern of protecting “[a] tribe’s right to define its own membership.” Id. at 917; see also Cohen’s, supra, at 175 n.25 (explaining that banishment and disenrollment must be analyzed differently, and “[w]here the tribe clearly separates the banishment and disenrollment decisions ... only the former is reviewable under the Indian Civil Rights Act’s habeas corpus provision”).
Second, by emphasizing that “[disen-rollment does not mean that a person is banished from the [tribe’s] Reservation” and that a disenrolled tribe member’s “movements have not been restricted,” Jef-fredo acknowledged that banishment in *887 herently involves physical coercion that more severely restrains an individual’s liberty, and thus is more likely to qualify as “detention.” 599 F.3d at 916, 919. Although the Jeffredo petitioners were denied access to a senior citizens’ center, a health clinic, and a tribal school, we were careful not to equate “the denial of access to certain facilities” with banishment from the reservation. Id. at 918-19. And for good reason: denying an individual access to certain government facilities is a far cry from denying'her access to her homeland. Thus, Jeffredo undermines, rather than supports, the majority’s determination that Ta-vares’s banishment fails to satisfy the ICRA’s “detention” requirement.[10]
B.
Tavares is banned from “all Tribal properties and/or surrounding facilities.” This total physical exclusion affects Tavares’s daily life in many ways: she cannot walk her grandchildren to school, attend tribal meetings, ceremonies, and events, or join her family and friends for any purpose on tribal land. A former leader of the UAIC, she no longer can “participate in the ceremonies and events of the Tribe’s culture and heritage'.” Instead, she “ha[s] had to sit outside the fence and look on, as if [she] were [a] criminal ] or untouchable[ ].”[11] Tavares has demonstrated a severe restraint on her liberty not shared by other members of the tribe, which satisfies her burden of showing that she is in “custody,” and thus in “detention.”
The majority makes much of the fact that Tavares was banished “only ... temporarily.” Maj. Op. 877. But the majority’s opinion does not explain why the duration of Tavares’s banishment is legally relevant in determining whether she is in “detention” for habeas purposes. The writ of habeas corpus addresses the fact of detention, not its duration. An individual restrained for a day has no more freedom during the period of restraint than another restrained for a year. Thus, habeas relief is available to a prisoner no matter the length of his sentence.
Even if the duration of Tavares’s banishment were relevant in determining whether she is in “detention,” the ten-year term of her banishment is sufficient to severely restrain her liberty. If fourteen hours of mandatory attendance at an alcohol rehabilitation program, Dow, 995 F.2d at 922, or five hundred hours of mandatory community service, Barry, 128 F.3d at 161-62, is long enough to severely restrain an individual’s liberty, then surely ten years— more than eighty thousand hours — of banishment is, too. Moreover, Tavares is an elderly woman. A ten-year period of banishment may constitute much of the remainder of her lifetime.
Nor is it clear how ■ “temporary” non-permanent banishment orders are within the UAIC. The case of Tavares’s daughter, *888 Angelina (“Angie”) Rey, is instructive. According to Tavares, the tribe banished Rey for one year for “defamation.” During her year of banishment, Rey was photographed “stepping] into [the tribe’s] casino briefly” and was “banished for another year with her per capita payments and all membership privileges suspended for a year.” As a result, Rey “was evicted from her home and, without a home, was unable to regain custody of her[ ] children.” Given Tavares’s advanced age and the UAIC’s history of compounding “temporary” banishment orders, ten years of banishment is not a significantly less severe restraint on Tavares’s liberty than if the banishment order were permanent.
C.
Undisputedly, Congress had the authority to create federal jurisdiction over violations of the ICRA, and it chose habeas review as the vehicle for those claims. Santa Clam Pueblo, 436 U.S. at 56-58, 98 S.Ct. 1670. Critically, “Congress’ provision for habeas corpus relief, and nothing more, reflected a considered accommodation of the competing goals of preventing injustices perpetrated by tribal governments, on the one hand, and, on the other, avoiding undue or precipitous interference in the affairs of the Indian people.” Id. at 66-67, 98 S.Ct. 1670 (internal quotation marks omitted); see also id. at 67, 98 S.Ct. 1670 (“Congress apparently decided that review by way of habeas corpus would adequately protect the individual interests at stake while avoiding unnecessary intrusions on tribal governments.”). In enacting § 1303, Congress struck a balance between the protection of tribal sovereignty and the vindication of civil rights. Our job is not to alter that balance based on our own views about the competing values at stake. Rather, we ought simply to apply the standards of federal habeas law.
This is a responsibility that Congress explicitly delegated to the courts, and one for which we are uniquely suited and, indeed, have a duty to perform.[12] But the majority contends that tribes’ authority to ban non-members from tribal land must mean that banishment orders cannot invoke habeas jurisdiction. The majority claims that if banishment orders trigger jurisdiction under § 1303, under which the privilege of the writ of habeas corpus is “available to any person” detained by a tribe, then “any person” under a banishment order — including non-members of the tribe — would enjoy federal habeas review. Because that cannot be the case, the majority concludes that the only way to reconcile the intrusion upon tribal sovereignty embodied by § 1303 is to bar from habeas jurisdiction all banishment orders, including whatever it is the majority means by “exclusion.”
The majority’s reading assumes too much. Tribes’ power to ban non-members from their land is rooted in their inherent power as separate sovereigns. By contrast, tribes’ power to ban tribal members from their land was explicitly “litait[ed]” and “modified]” by Congress’s usé of its “pie- *889 nary authority” to provide individual rights to American Indians and to establish a narrow mechanism of federal judicial'review to protect those rights. Santa Clara Pueblo, 436 U.S. at 56, 98 S.Ct. 1670. There is no particular reason why we must treat an order banning a tribal member who enjoys legitimate associations of kin, culture, tradition, and birthright to the tribe as equivalent to one banning a nonmember with no such associations; indeed, for the purposes of § 1303, we ought not to. To so hold is to choose a blunt tool, even while more precise analytical instruments are available.
D.
The majority believes that by exercising habeas jurisdiction over Tavares’s ten-year banishment, we “would create a perverse incentive for tribes to first disenroll and then banish a member” to avoid federal review of the temporary banishment. Maj. Op. 877. The true effect of the majority’s decision is to render unnecessary that “two-step dance,” Maj. Op. 877; all a tribe would need to do to evade federal review is to temporarily banish a member- — whether for ten years or fifty, or longer. This creates a different “perverse incentive”: to banish a member “temporarily” — say, for ten years — -and then to extend the banishment, again “temporarily,” perhaps for another ten, and so on. The majority opines that Tavares’s requested remedy “runs counter to Congress’s goal of ‘strengthening the position of individual tribe members vis-a-vis the tribe’ by enacting the ICRA,” Maj. Op. 877 (quoting Santa Clara Pueblo, 436 U.S. at 62, 98 S.Ct. 1670), but that is precisely backward. It is the majority’s opinion that runs counter to and weakens that goal. The majority’s decision makes the individual rights that Congress championed in the ICRA dependent upon the whims of the tribe and hands the tribe the tool by which it can evade our habeas review — the only relief that the individual tribal member has against arbitrary or retaliatory violations of her ICRA rights.
IV.
Balancing individual civil rights against the importance of tribal sovereignty, Congress in 1968 decided that the doors of the federal courts are open to American Indians claiming unlawful and significant restraints on their liberty by their tribes. It is not for us to adjust the lines that Congress has drawn based on our own personal views of where the limits should be drawn. Despite Congress’s instruction to the contrary, the majority denies Tavares the opportunity to challenge her detention in our courts. I respectfully dissent.

. The ICRA’s free expression clause reads in relevant part, "No Indian tribe in exercising powers of self-government shall ... (1) make or enforce any law ... abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble and to petition for a redress of grievances....” 25 U.S.C. § 1302(a).

. The majority opinion avoids referring to the Petitioners’ “banishment,” using instead the euphemism "exclusion.” Maj. Op. 867-68. My use of the terms "banned” and "banishment” reflects the language the UAIC Tribal Council used to describe the punishment it meted out to Petitioners. The UAIC does not dispute that Petitioners were "banned.”

. Section 1303 states, in full, "The privilege of the writ of habeas corpus shall be available to any person, in a court of the United States, to test the legality of his detention by order of an Indian tribe.”

. The majority opinion contends that we ought to disregard this piece of legislative history in part because Colliflower involved a prisoner incarcerated due to a criminal conviction, and so did not consider the scope of "detention” beyond "the traditional confines of habeas corpus jurisdiction.” Maj. Op. 873 n.12. Of course, an identical point can be made about Preiser v. Rodriguez, 411 U.S. 475, 484-85, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), on which the majority relies to support its argument that "physical confinement” is a requirement of "detention,” Maj. Op. 871, but there the majority seems unconcerned with this distinction.
My point is not that Colliflower is authoritative precedent for the exact issue before us. If it were, such a lengthy decision would be unnecessary. But given that there is, as the majority opinion notes, little other legislative history for us to consider, Maj. Op. 873, Colli-.flower is relevant because it apparently guided Congress’s understanding that the habeas provision it was enacting within ICRA would be as broad as the federal habeas statutes that had long been part of the nation’s laws. The majority opinion does not respond to this point.

. See, e.g., Bailey v. Hill, 599 F.3d 976, 979 (9th Cir. 2010) ("We have repeatedly recognized that the imposition of a fine, by itself, is not sufficient to meet [28 U.S.C.] § 2254’s jurisdictional requirements.”).

. The Supreme Court’s broad construction of the "custody” requirement reflects the wide scope of application that the writ has enjoyed for centuries. For example, William Blackstone explained that the writ is "efficacious ... in all manners of illegal confinement.” 3 William Blackstone, Commentaries on the Laws of England 131 (Univ. of Chicago Press 1979) (1768); see also Ex parte McCardle, 73 U.S. (6 Wall.) 318, 325-26, 18 L.Ed. 816 (1867) (characterizing the writ of habeas corpus as the judicial remedy for “every possible case of privation of liberty contrary to the National Constitution, treaties, or laws,” the scope of which is so broad that it is "impossible to widen”).

. Likewise, in Barry v. Bergen County Probation Department, the Third Circuit held that court-ordered community service constituted . "custody” because an “individual who is required to be in a certain place — or in one of *884 several places — to attend meetings or to perform services, is clearly subject to restraints on his liberty not shared by the public generally.” 128 F.3d at 161.

. The majority cites Preiser v. Rodriguez, 411 U.S. 475, 484-85, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), for the proposition that physical confinement was once a prerequisite to habe-as relief. Maj. Op. 871-72. Notwithstanding that it is now “well established that actual physical custody is not a jurisdictional prerequisite for federal habeas review,” Poodry, 85 F.3d at 893 (citing Jones, 371 U.S. at 243, 83 S.Ct. 373), the circumstances of Preiser are not comparable to Tavares’s banishment.
The Preiser petitioner was a state prisoner seeking release, which explains why the Court used "custody,” "detention,” and "physical confinement” interchangeably to describe Preiser's situation. See 411 U.S. at 483-87, 93 S.Ct. 1827. Contrary to the majority’s suggestion, the Court never intimated that "detention” was somehow a subset of "custody.” To the contrary: if Preiser, a non-ICRA case, stands for anything, it is that "detention” and "custody” are interchangeable in habeas law.

. Decided twenty years ago, Poodry has since become the leading authority on banishment as a basis for federal habeas jurisdiction. See 1 Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice and Procedure § 8.2[d], 449 & 449 n.53 (6th ed. 2011) (citing Poodry, 85 F.3d at 894-96); Ryan Fortson, Advancing Tribal Court Criminal Jurisdiction in Alaska, 32 Alaska L. Rev. 93, 147 (2015) (characterizing Poodry as the "seminal case addressing banishment”); see also William C. Canby, Jr., American Indian Law in a Nutshell 419 (6th ed. 2015) (discussing Poodry).
Notwithstanding Poodry's significance, the majority opinion selectively quotes from an article by Professor Patrice Kunesh criticizing Poodry in an attempt to discount Poodry's persuasive value. See Maj. Op. 876 n.14. But Kunesh's problem was not that Poodry applied "jurisdictional prerequisites under federal habeas corpus laws” to "ICRA’s habeas corpus provision,” which is the issue before us. Patrice H. Kunesh, Banishment as Cultural Justice in Contemporary Tribal Legal Systems, 37 N.M. L. Rev. 85, 123. Rather, Ku-nesh's criticisms were aimed at “the reach of *886 the court’s decision to disenrollment actions;” the court’s disregard for "tribal legal systems;” and the portions of Poodry’s holding that "extend[ed] far beyond federal habeas corpus jurisprudence,” including to "potential and threatened restraints on an individual’s liberty,” general "harassment,” and "iii-terference” with the provision of utilities and health care services. Id. at 123-24. None of the targets of Kunesh’s criticisms of Poodry is present in this case. And, of course, Poodry remains good law in the Second Circuit and persuasive authority in ours.

. Jeffredo also comports with federal habeas precedents holding that the revocation of certain privileges or licenses, without a concomitant restraint on an individual’s physical liberty, does not satisfy the "custody” requirement of federal habeas jurisdiction. See, e.g., Lefkowitz v. Fair, 816 F.2d 17, 19-21 (1st Cir. 1987) (revocation of medical license). Jeffredo's analysis of disenrollment is ' likewise consistent with other courts’ analysis of "[djignitary, reputation, ‘moral,’ or psychological harm,” which generally are considered "noncustodial statuses.” Hertz & Liebman, supra, at 451-53 & 452 n.66 (collecting cases).

. Here, "both parties submitted declarations in connection with the motion to dismiss, [and] because no evidentiary hearing was held we must accept [Tavares’s] version of events as true for the purposes of establishing jurisdiction and surviving a 12(b)(1) motion.” Rhoades v. Avon Prods., Inc., 504 F.3d 1151, 1160 (9th Cir. 2007).

. The Supreme Court has referred to “the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them.” Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); see also Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 404, 5 L.Ed. 257 (1821) ("It is most true that this Court will not take jurisdiction if it should not: but it is equally true, that it must take jurisdiction if it should. The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.”).